# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

CHRISTIAN D. WALKER,

    Petitioner,

vs.

JACKIE CRAWFORD, et al.,

    Respondents.

Case No. 2:04-cv-00929-KJD-PAL

**ORDER**

    Per the directions of the court of appeals, this court has held an evidentiary hearing on whether petitioner can demonstrate actual innocence to excuse the untimeliness of this action. Actual innocence can excuse operation of the statute of limitations. McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013). "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Id. (quoting Schlup v. Delo, 515 U.S. 298, 329 (1995)). The court finds that petitioner has not demonstrated actual innocence, and the court dismisses this action.

    At trial, the following evidence was produced. At J.M. Ullom Elementary School in Las Vegas, petitioner was showing off his gold necklace to David Dimas, Lionel Hernandez, Mysty Fuller, and Maureen McConaha. They also were smoking marijuana. Petitioner then left with Fuller and McConaha but unknowingly without his necklace, and Dimas and Hernandez went to

their homes. Ex. 58, at 43-46 (#58).[1] Some time later, petitioner arrived at Dimas' house, asking where his necklace was. Dimas denied that he possessed the necklace. Petitioner stated that he "ain't going out like no punk," and he left. Id. at 46-50 (#58). Even later, petitioner arrived at Dimas' house with his mother, Annette Walker, and again demanded the necklace. Dimas continued to deny that he possessed the necklace. Petitioner's mother threatened a small-claims action, and the two left. Id. at 51-52 (#58). Finally, around 11:00 p.m., Dimas was outside smoking before bed, and his friend Brandon Douzat was with him. Petitioner and his cousin Johnny Walker, who was unknown to Dimas and Douzat, walked up to them. Petitioner told Dimas that he did not believe that Dimas possessed the necklace. Either petitioner or Johnny[2] suggested that they go across the street to Ullom Elementary to smoke marijuana. They went across the street, and everybody but Johnny smoked marijuana. At the end, everybody started shaking hands. When Dimas offered to shake Johnny's hand, Johnny grabbed Dimas' right arm with his left hand. Johnny then drew a small-caliber handgun with his right hand and pointed it at Dimas. Dimas ducked, Johnny fired, and the bullet passed through Dimas' neck without causing a life-threatening injury. Dimas and Douzat ran away. Both of them heard two more shots. Id. at 58-67 (#58); Ex. 59 at 89-94 (#59).

At the evidentiary hearing, Johnny took the blame. He said that he was speaking with petitioner at the group home run by Annette, at 4835 Terra Linda Avenue, about the loss of petitioner's necklace. Then petitioner's pager received a signal. Petitioner went inside to make a phone call. Petitioner then invited Johnny to walk to the home of his some-time girlfriend Tawsha Orillo[3] because her sister Angel also would be there. On the way, they passed Dimas' house and encountered Dimas and Douzat outside. Transcript, at 11-12 (#74). Petitioner told Dimas that he

---

[1] The parties filed a joint list of exhibits admitted into evidence (#65), but the exhibits have not been filed electronically in that form. For ease of reference, the court will refer to the exhibits by their location in the court's electronic filing system.

[2] Other than petitioner, the court will refer to people with the surname of Walker by their given names.

[3] Her name is spelled "Tosha" in the evidentiary hearing transcript. The parties stipulated that Tawsha Orillo died in 2008.

did not think that Dimas had stolen petitioner's necklace. Id. at 13 (#74). Johnny then thought that if Dimas did not possess the necklace, then at least he would know who did. Johnny was carrying a concealed handgun, and he decided to threaten Dimas into telling who had the necklace.[4] Id. at 13-14 (#74). Johnny suggested that they all go across the street to the elementary school and smoke marijuana. They agreed. At the end, when people started shaking hands, Johnny, being left-handed grabbed Dimas' right hand with his own right hand, drew his gun with his left hand, and pointed the gun at Dimas' head. Dimas jerked, and Johnny unintentionally fired the gun. Dimas and Douzat ran away, and petitioner was shocked. Johnny told petitioner that they needed to leave. Id. at 16-17 (#74). Johnny insisted that petitioner did not know what Johnny intended to do. Id. at 17.

Johnny testified that he related his story to three people. First, he testified that he told the above story to Gerald Walker, petitioner's father, before he was arrested. Transcript, at 17-18 (#74). Second, he testified that on the day that they were arrested, he gave petitioner a letter or affidavit offering to testify to the above story. Id. at 19 (#74). Third, he testified that in 2002 he wrote an affidavit with the assistance of a fellow inmate named Ken Lake in which he stated that he had mailed to petitioner's counsel, John Fadgen, an affidavit describing the above story. Id. at 46-48 (#74).

Less than two weeks after Johnny shot Dimas, petitioner and Johnny shot Maureen McConaha to death. The police investigation of McConaha's death led them to petitioner's and Johnny's involvement in the shooting of Dimas.

Petitioner and Johnny originally were to be tried jointly. Fadgen, petitioner's counsel, moved to sever the trial. He argued that the defenses would be antagonistic and, relevant to the issue at hand, he argued that if Johnny was tried separately then he would testify in petitioner's defense. Ex. 17 (#56). Johnny joined in the motion, and the state district court granted it.

Johnny was tried first. His first trial ended in a mistrial. His second trial ended with him found not guilty of attempted murder with the use of a deadly weapon and convicted of battery with the use of a deadly weapon. Ex. 66 (#59)

---

[4]At that time, Johnny had been convicted of at least one felony, and he was on probation.

-3-

After Johnny's second trial, Fadgen filed an ex parte motion asking that Johnny be made available to testify at petitioner's trial. Ex. 52 (#58). The state district court granted the motion in an ex parte order. Ex. 56 (#58).

Petitioner then was tried. Johnny did not testify at petitioner's trial. Petitioner was convicted of attempted murder with the use of a deadly weapon. Ex. 85 (#60).

Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 87 (#60). For the purposes of 28 U.S.C. § 2244(d)(1)(A), the judgment of conviction became final on September 20, 1999.

Petitioner filed his first post-conviction habeas corpus petition in state district court on July 14, 2003. Ex. 93 (#60). The state courts determined that it was untimely under Nev. Rev. Stat. § 34.726(1). Ex. 108 (#60). The Nevada Supreme Court issued its remittitur on March 30, 2004. Ex. 109 (#60).

This court received petitioner's original, proper person habeas corpus petition on July 2, 2004. The court determined that the action was untimely. Even giving petitioner the benefit of the doubt and assuming that petitioner did not learn about the conclusion of his direct appeal until August 13, 2001, after Fadgen had died and after petitioner had asked his counsel in the McConaha murder case to look into the Dimas shooting case, the one-year period of 28 U.S.C. § 2244(d)(1) expired eleven months before petitioner filed his state habeas corpus petition. The court found that petitioner was not entitled to equitable tolling because his post-conviction counsel failed to take § 2244(d) into account in deciding when to file the state habeas corpus petition. That part of the court's decision has been affirmed. The court also found that Johnny's 2002 affidavit did not demonstrate petitioner's actual innocence. That part of the court's decision was reversed and remanded for an evidentiary hearing.

Petitioner filed a second state habeas corpus petition on November 7, 2007. Ex. 110 (#60). Ultimately, the Nevada Supreme Court ruled that the petition was untimely, successive, and abusive of the writ. Ex. 168 (#61). The second state habeas corpus petition does not affect the timeliness of this action.

The court first discounts Gerald's testimony. Both Johnny and Gerald testified that Johnny had told Gerald in 1997, before Johnny's arrest, that the shooting of Dimas was not intended, that Johnny intended only to scare Dimas into revealing who possessed petitioner's necklace, and that petitioner had no knowledge of Johnny's intention. This purported statement in 1997 is important because it is a prior consistent statement that would have been admissible when it could have affected Johnny's penal interests.

On cross-examination, Gerald stated that the evidentiary hearing in 2014 is the first time he has testified to Johnny's statement in any court. Transcript, at 143 (#74). Gerald also stated that the first people to whom he spoke about Johnny's statement were petitioner's current attorneys. Id. (#74). He did not even speak about Johnny's statement to the detectives who interviewed him about the McConaha murder. Id. (#74). This would have been helpful because, perhaps unbeknownst to Gerald, the same detectives were assigned to both cases. This court appointed the Federal Public Defender to represent petitioner on May 22, 2009. Even if petitioner's counsel contacted Gerald that same day—an unlikely possibility given that counsel would need to investigate the case first—that was ten and a half years after petitioner's trial. The evidentiary hearing in this court in July 2014 was almost sixteen years after petitioner's trial. The court simply does not believe that Gerald would have kept quiet for this long a time and let his son sit in prison for a crime that his son did not commit.[5] Instead, the court believes that Johnny never did tell Gerald what had happened in 1997, and that both Johnny and Gerald were not telling the truth in their testimonies in the 2014 evidentiary hearing.

This leaves the purported 1997 letter or affidavit to Fadgen as the only possible statement that Johnny made before his trials in the Dimas shooting. Petitioner has not produced a copy of this letter. Counsel stated at the evidentiary hearing that Fadgen's file of petitioner's case was destroyed after Fadgen's death. The three stories behind this document all are different. In his 2002 affidavit,

---

[5] Petitioner also has a sentence of life imprisonment with eligibility for parole after 10 years for the murder of Maureen McConaha, plus an equal and consecutive sentence because he used a deadly weapon. However, that sentence runs consecutively to the sentence for the Dimas shooting. If petitioner could gain relief from his sentence in the Dimas shooting, that time would be credited to the sentences for the McConaha murder.

Johnny stated that he wrote a letter to Fadgen, taking all the blame for himself, and that Fadgen never responded. Amended petition, at 68-69 (#8).[6] Ken Lake, the inmate law clerk, testified that he helped Johnny with typing out that affidavit. In his 2014 evidentiary hearing testimony, Johnny testified that on the night that police arrested him and petitioner, he and petitioner were housed near to each other on the 9th floor of the jail. He further testified that he wrote an affidavit offering to testify in petitioner's defense and gave it to petitioner for petitioner to give to his own lawyer. Transcript, at 19 (#74). Although petitioner did not testify at the evidentiary hearing, he never has stated that he received this 1997 letter or affidavit from Johnny. Instead, petitioner stated in his own affidavit that he saw the 1997 letter or affidavit in Fadgen's case file, and that he knew that Johnny had mailed it to Fadgen. Amended petition, at 65-66 (#8). Petitioner and Johnny have contradicted each other, and Johnny has contradicted himself. Johnny's testimony does not give the court confidence that this 1997 letter or affidavit actually existed.

Finally, Johnny's own statements after the jury found him guilty lead the court not to believe that this 1997 letter or affidavit existed. When it mattered to Johnny, Johnny maintained his complete innocence. After the verdict, Johnny wrote a statement for the pre-sentence investigation report. He stated with emphasis that he did not commit the crime. At the sentencing hearing, when the judge asked him about his statement in the report, Johnny confirmed that he did write the statement, and he stated further that he went to trial because he did not commit the crime. Ex. 50, at 9 (#58). When the judge started explaining his reasoning behind the sentence he was about to impose, Johnny interrupted and stated that he did not commit the crime. Id. at 15 (#58). Then Johnny appealed, and the appeal was pending while petitioner was tried.

Johnny and petitioner have tried to explain his earlier statements by arguing that he was over-charged with attempted murder. The court agrees with respondents' comment in footnote 3 at page 6 of their answering brief. If Johnny was willing to recognize then, as he claims to do now, that he grabbed Dimas intentionally and shot him, even unintentionally, then he would have

---

[6]The page numbers in citations to the amended petition (#8) are those created by the electronic filing system.

-6-

admitted that he had committed the general-intent crime of battery with a deadly weapon. It would have been the basis for plea negotiations, and then Johnny could have testified in petitioner's trial.

Nonetheless, Fadgen seemed to have some reason to think that Johnny might testify favorably for petitioner. Fadgen moved to sever the trials of petitioner and Johnny. He argued in part, based on information and belief, that Johnny would testify on petitioner's behalf if the trials were severed.[7] After Johnny was convicted, Fadgen filed an ex parte motion asking for Johnny's production at petitioner's trial, and the state district court granted it. The court does not know, and probably never will know, why Fadgen thought that Johnny would testify at petitioner's trial. Perhaps, despite all the reasons given above, Johnny actually did write an affidavit or letter in 1997 in which he took the blame, and then it was lost. Perhaps petitioner told Fadgen that he believed that Johnny would testify.[8]

The prosecutor, Elissa Luzaich, testified at the evidentiary hearing, and she said that she could speculate why Johnny did not testify. The parties disagree over whether Fadgen's reasons not to call Johnny are relevant. The court can think of one obvious reason, based upon Johnny's actual behavior at the time: He would have invoked his privilege against self-incrimination under the Fifth Amendment and the equivalent Nevada constitutional provision. He maintained his innocence throughout trial, at sentencing, and his direct appeal was pending when petitioner was tried. Johnny's testimony would have put an end to his appeal.

Nonetheless, Johnny testifies now that he would have testified at petitioner's trial that what led up to the shooting of Dimas was entirely his idea and that petitioner had no knowledge. The court will assume that Johnny would have been granted use immunity and thus would have testified

---

[7]Fadgen also argued in part that the defenses of petitioner and Johnny were antagonistic. That argument was true. Each person's defense was to blame the other person.

[8]This possibility has potential support. When in jail, petitioner wrote a letter to Tawsha Orillo. He noted that somebody told him that Johnny would give evidence against petitioner. Petitioner discounted that notion, because he felt that he and Johnny were too close for Johnny to do that.
The prosecution used this letter, heavily redacted, at trial to refute the notion that petitioner and Johnny were just cousins without a close relationship, and thus to refute the argument that Johnny was acting on his own.

at petitioner's trial. Johnny's testimony, like the testimony of any witness, would be subject to cross-examination and impeachment.

Johnny's reason for being at Dimas' house does not withstand scrutiny. Again, Johnny testified that petitioner invited him to walk to the residence of Tawsha Orillo so that Johnny could meet Tawsha's sister Angel, and they just happened to walk past Dimas' house while Dimas was outside. As the cross-examination progressed, Johnny gradually forgot that the journey to Tawsha's residence was why he was at Dimas' house, to the point that counsel for respondents had to remind Johnny of his own story. Transcript, at 68 (#74). Johnny complained in cross-examination that counsel for respondents was playing word games with him. Id. at 62 (#74). Counsel for respondents was insistent in his cross-examination of Johnny, but he was not badgering or overbearing. Counsel for respondents was doing nothing more than asking Johnny about the inconsistencies in his own story. Petitioner's two attorneys would have raised objections if they had felt that the questioning was inappropriate, as they did in many other occasions during the hearing.

Johnny's intake forms for the Las Vegas Justice Court, a seemingly minor detail, also undermines his story. At the evidentiary hearing, Johnny testified that he was living with someone named Oscar in an apartment across the street from petitioner's house at 4835 Terra Linda Avenue. Transcript, at 8 (#47). The intake forms were completed on October 9 and 22, 1997, shortly after his arrest. Johnny gave as his address 2101 Sandy Lane, Apartment F-8, and he resided with "Tasha," age 18 years, for one month. Ex. 3, at 13-14 (#56). On cross-examination, he said that this person was not Tawsha Orillo, but some other person named Tasha. Transcript, at 61 (#74). Johnny also testified that he did not remember filling out the form and living with this Tasha. Id. at 22-24 (#74). This cannot simply be a matter of poor recollection. The name of his roommate and the name of the street are completely different. Johnny lied either on his intake forms or in his evidentiary hearing testimony. If the court cannot believe Johnny on a minor matter, then the court cannot trust his testimony on more meaningful matters.

Johnny's evidentiary hearing testimony also is contradicted by testimony at trial. He testified that he grabbed Dimas' hand and pointed a gun at Dimas, then Dimas ducked or jerked, and then he fired the gun unintentionally. Dimas testified to the same thing at trial, although there is a

dispute over which hand Johnny used to grab Dimas and which hand Johnny used to hold the gun. Johnny testified that he and petitioner left the school. However, both Dimas and Douzat testified that they ran away after that shot, and then they heard two more shots. Johnny's testimony does not explain the difference in number and timing of shots.

Luzaich, the prosecutor, testified at the evidentiary hearing that she was ready to impeach Johnny. First, Johnny had at least one prior adult felony conviction, attempted burglary, and she could have questioned Johnny about what the crimes were and when he had committed them. Second, Johnny had just been acquitted of attempted murder with the use of a deadly weapon and convicted of the lesser-included offense of battery with the use of a deadly weapon. Johnny's testimony that it was all his idea would have exposed him to no more criminal liability. His testimony would not even have affected his appeal because the court has assumed that Johnny would have been granted use immunity. Third, Johnny's own statements in the pre-sentence investigation report and at the sentencing hearing would have contradicted his trial testimony. When his own freedom was at stake, Johnny himself, not just defense counsel following a trial strategy, insisted that he was innocent. Johnny's testimony is exactly the type that needs to be treated with skepticism. See Herrera v. Collins, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring).

In conclusion, Petitioner has presented no reliable evidence that Johnny actually did inform petitioner's counsel in 1997 that Johnny was willing to testify on petitioner's behalf. Neither Johnny nor Gerald are credible witnesses on that issue. Furthermore, even if Johnny testified at trial, he would not have been a credible witness who would have given reliable testimony. He would have been impeached with his own prior inconsistent statements and his criminal record. The court agrees with respondents that, "[f]or the purposes of Schlup at least one reasonable juror would find Johnny [Walker's] statements suspect and still vote that Christian Walker was guilty of attempt murder." Answering Brief, at 19 (#77). Petitioner has not demonstrated actual innocence.

Reasonable jurists might debate this conclusion, and the court will issue a certificate of appealability.

IT IS THEREFORE ORDERED that this action is **DISMISSED** with prejudice as untimely. The clerk of the court shall enter judgment accordingly and dismiss this action.

IT IS FURTHER ORDERED that a certificate of appealability is **GRANTED** on the issue whether petitioner has demonstrated actual innocence to equitably toll the period of limitation.

DATED:    March 30, 2016

_____
KENT J. DAWSON
United States District Judge